
IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 18, 2017 Session

## RAINA FISHER v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Maury County**
**No. 19513    Russell Parkes, Judge**

_____

**No. M2016-00594-CCA-R3-PC**

_____

The Petitioner, Raina Fisher, was convicted of three counts of theft of property valued over $1,000, one count of theft of property valued over $500, and one count of attempted theft of property valued over $1,000. The Petitioner filed a timely post-conviction petition, alleging that her trial counsel had provided ineffective assistance by failing to suppress evidence obtained through a judicial subpoena, failing to exclude evidence of her prior convictions, and failing to call certain witnesses who could have discredited the victim. She also alleged that appellate counsel was ineffective and that she was entitled to relief under a theory of cumulative error. The post-conviction court held a hearing and denied relief. After a thorough review of the evidence, we conclude that the Petitioner has not demonstrated prejudice resulting from any of her claims, and we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Joseph D. Baugh, Franklin, Tennessee, for the appellant, Raina Fisher.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Brent A. Cooper, District Attorney General; and Kyle E. Dodd, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL AND PROCEDURAL HISTORY

### Trial

The Petitioner and the victim, Chad Collier, had separated and were involved in a custody battle at the time that the thefts took place. The Petitioner used a bank account belonging to the victim, who was the father of her child, to make payments on a Discover card in the Petitioner's name. The State's theory of the evidence was that the Petitioner obtained the bank routing number without authorization and then used the funds to pay her credit card debt. The Petitioner, on the other hand, presented evidence that the victim had made prior payments on her Discover card and that the credit card's automated phone payment process merely asked her whether she would like to use the account on file. According to the Petitioner, the use of the victim's account was inadvertent, and she had intended to use her own account to make the payments.

The victim and the Petitioner entered into a relationship around late 2004 or early 2005. They began to live together shortly thereafter, and they had a daughter together. The Petitioner testified that she was employed in various capacities while the two were in a relationship, including providing counseling at a juvenile detention facility, working for Dell computers, and working with the Department of Children's Services. The victim initially denied that the Petitioner worked during their relationship but ultimately agreed that she had worked for a short time. The Petitioner also received a judgment of approximately $50,000 to compensate her for injuries suffered in a 2007 automobile accident. Both parties agreed that for the bulk of their relationship, the victim provided for the Petitioner financially and paid her bills.

The victim testified that he opened a personal account at Regions Bank in July 2008 and put several thousand dollars into the account, which was intended to be used solely for his daughter's expenses. The victim did not regularly monitor this account and knew that there should be several thousand dollars in it. The victim closed the account after he discovered the theft in 2009.

The Petitioner and the victim ended their romantic relationship around October 2008, but they continued to see each other afterwards. The victim testified that they continued contact through the holidays for the sake of their daughter, and the Petitioner testified that they continued to have a sexual relationship up until August 2009, which the victim denied. The Petitioner testified that she had been diagnosed with colon cancer in 2001 and that she subsequently became addicted to pain medication. In 2006, the Petitioner was convicted of one count of obtaining prescription medication through fraud

and one count of attempt to obtain prescription medication by fraud, and she was sentenced to probation. The State filed a notice of its intent to impeach the Petitioner with these convictions, and during the Petitioner's testimony, trial counsel asked the court to make a ruling on the admissibility of the prior convictions. The trial court stated that it could not recall exactly which rule would apply and noted that it would get the exact language of the rule later but that, as the case at bar was not drug-related, it found that the prejudicial effect would not outweigh the probative value. The trial court returned to the issue after the conclusion of proof, finding that under Tennessee Rule of Evidence 404(b), the convictions bore on the Petitioner's credibility and that the probative value was not outweighed by potential prejudice.

Both parties acknowledged that they had used drugs, including cocaine, during their relationship and that the victim funded their drug use. They disagreed on the allocation of blame, with the victim testifying that the Petitioner brought drugs into his life and the Petitioner testifying that the victim urged her to use drugs, even after her hospital stay, despite his awareness of her prior addiction.

In 2009, the Petitioner entered a drug rehabilitation program. The victim testified that the Petitioner entered the program "fairly immediately" after the holidays and that she was gone until August. While the Petitioner was gone, her friend worked as a nanny for the family because the victim's work schedule did not allow him to care for their daughter during the day. The Petitioner testified that, while she was in the rehabilitation program, her mother and the victim both paid her bills for her. The victim, on the other hand, testified that he did not pay any bills for the Petitioner after January or February 2009.

In August 2009, the Petitioner finished her rehabilitation program and began to set up an apartment because she was no longer living with the victim. Accordingly, the Petitioner was making many large purchases associated with establishing a household, including buying furniture for herself and for her daughter, who sometimes stayed with her.

While the victim and the Petitioner agreed that he had paid for her expenses prior to the end of their relationship, they disagreed on the method of payment. The victim testified that he had a Citi Visa credit card which he had permitted the Petitioner to use and which he paid every month. He further testified that he would occasionally sign checks which the Petitioner filled out or asked him to sign for their expenses. He testified, however, that he paid the bulk of his bills through his online bank account. The victim testified that he did not make phone payments and that he had had no reason to pay the Petitioner's Discover card bill because he had provided her with another credit card that he paid regularly. He testified that he did not believe he had ever made a

payment toward her Discover credit card, but he ultimately conceded that he might have made a previous payment to Discover by check.

The victim testified that the Petitioner had never had access to or authority to use his Regions bank account, and he stated that the checks he had written her for their daughter's expenses could have provided the Petitioner with the routing number of his account. However, he acknowledged on cross-examination that the first phone payment to Discover was made prior to the first check he had written to reimburse the Petitioner for expenses. He then speculated that she could have gained access to his checkbook when she was removing her belongings from their shared home in early August. The victim then also testified that the night before trial, he had discovered an additional payment to the Petitioner's account made from his Regions bank account in April 2009. He stated that he did not authorize that payment and would have sought to prosecute the Petitioner regarding the payment if he had been aware of it previously.

The Petitioner, on the other hand, testified that the victim had made payments on her Discover card while they were together. She testified that he had been paying her bills and that she used the phone payment system during their relationship. She also stated that their nanny had asked the victim about the Petitioner's bills in 2009 and that the victim had made payments on her bills in 2009.

At trial, the State introduced the victim's bank records, which showed that four withdrawals were made to "Discover Phone Pay Fisher Raina" in August and September 2009. The payments reflected on the statement were: a payment of $3,127.68 made on August 20, 2009; a payment of $4,263.54 made on August 27, 2009; a payment of $820.49 made on September 1, 2009; and a payment of $2,000 made on September 15, 2009. The victim testified that on November 6, 2009, he was alerted by the bank that his account was overdrawn. When he investigated, he discovered the previous credit card payments. The account had been overdrawn when someone attempted to make a payment of over $4,000 on the Discover card in November. The victim did not ask the Petitioner about the transactions but immediately contacted the police. The Petitioner was arrested on November 13, 2009, and on November 23, 2009, the victim filed a petition for custody of their child based in part on the theft charges. He testified that he was not motivated to bring charges against the Petitioner in order to prevail in the custody hearing because he currently had custody, but he admitted on cross-examination that he had obtained custody in part based on the charges brought against the Petitioner. He acknowledged that he and the Petitioner were not on amicable terms, and he did not deny that he had threatened to imprison the Petitioner the night before trial when she called to say she would be late to drop off their daughter.

The victim's bank records reflected that between August 15, 2009, and September 15, 2009, the victim wrote checks from the Regions account to a nanny and to the Petitioner, which the victim testified were for his daughter's expenses. The account also reflected a mortgage payment and numerous ATM withdrawals.

The State presented the testimony of Mr. Jerry Brown, a field investigator for Discover Financial Services, and through Mr. Brown introduced the Petitioner's credit card statements. The statements reflected the four payments in the amounts charged to the victim's bank account, and these were designated as "phone payments." The Discover statement also showed a phone payment for $1,310.54 which was made on August 10th, prior to the payments made from the victim's account, and "returned" on August 13th. Mr. Brown testified that a payment might be returned if the account making the payment had insufficient funds or were closed. The statements reflected that a payment of $732 was made on September 16, 2009, and a payment of $3,351 was made on October 10, 2009, and these payments were not made by phone.

The Petitioner testified that her mother and the victim had been paying her bills while she was in rehabilitation. She testified that she had made the $1,310.54 phone payment on her credit card on August 10th, that the representative had asked her if she wanted to use an account on file and gave her the last four digits of that account, and that she had simply agreed. At the time, she believed that her mother's account would be on file because it was the most recent account that had paid her bills. The Petitioner's bank statements were introduced into evidence and reflected that she made a $10,000 deposit to her own bank account on the next day, August 11, 2009. She accordingly wrote her mother a check on August 11th for $1,300 to reimburse her. The check was part of the statement introduced into evidence. When the $1,300 phone payment was returned a few days later, the Petitioner testified that she assumed that the account on file had been another one of the victim's accounts that had since been closed.

She then called on August 19th to make the first phone payment that came out of the victim's Regions account. The Petitioner testified that again, she did not have to enter any bank account information but simply agreed to use an account on file. She did not check the numbers given to her, but she believed that the account on file should have been her own account. She testified that she made the other August and September payments under the same belief. The Petitioner testified that, after she received her bank statement in September, she became aware that the money was not being taken from her own account. She accordingly visited her bank and spoke to a representative to find out why the payments were not reflected. The Petitioner acknowledged on cross-examination that her account would have been overdrawn had the Discover payments actually been debited from her account, but she explained that her own checkbook reflected that she should have had significantly more money in her own account. The Petitioner explained

- 5 -

that she then made two check payments to her credit card in September and October, for $732.60 and for $3,351.61. Because she believed that the credit card company would save the information from her check and use that account in the future, she attempted another phone payment in November.

Mr. Harry Dryer, a representative from the Petitioner's bank, testified that the Petitioner came to see him multiple times beginning on September 9, 2009, because her check book did not reflect the amount in her account. The Petitioner "thought that there were some deposits that she had not posted" and was looking for "some deposits that she had missed" or "something she forgot to write down."

The Petitioner's testimony regarding her phone payments was that she would speak to a representative, that the representative would ask her if she would like to pay in the account ending in a particular four digits, and then she would simply agree. The Discover card representative, however, testified that a phone payment could only be made if the customer had the entire bank routing number, and he testified that the customer would have to provide the entire number for each payment. The representative acknowledged that he did not work with Discover at the time that the phone payments were made.

The Petitioner was convicted of three counts of theft of property valued $1,000 or more but less than $10,000, one count of theft of property valued $500 or more but less than $1,000, and one count of attempted theft of property valued $1,000 or more but less than $10,000. She was sentenced to serve seven years on probation. On direct appeal, she challenged the sufficiency of the evidence, and this court affirmed her convictions. *State v. Raina Fisher*, No. M2012-00750-CCA-R3-CD, 2013 WL 3411623 (Tenn. Crim. App. July 3, 2013), *perm. app. denied* (Tenn. Nov. 14, 2013).

## Post-Conviction

The Petitioner filed a timely petition for post-conviction relief. In the petition, she argued that her trial counsel was deficient in failing to suppress any financial records which the State had improperly obtained through a judicial subpoena and in introducing further records as part of the defense. She also argued that her prior convictions should not have been admitted and that trial counsel was deficient in not excluding them. The Petitioner alleged that trial counsel failed to obtain the testimony of several witnesses who could have bolstered her credibility and detracted from that of the victim. She also alleged deficiency at sentencing and on appeal.

At the post-conviction hearing, Detective Terry Chandler, who worked with the Maury County Sheriff's Department at the time of the thefts, testified regarding his

investigation of the case. According to Detective Chandler, the victim contacted police and "wanted [the Petitioner] arrested." Detective Chandler testified that he had assisted the victim and had obtained a judicial subpoena in order to determine whether or not the Petitioner should be charged with any crimes. He believed that the victim had himself obtained the warrant to arrest the Petitioner. Detective Chandler testified that the judicial subpoena was signed by a judicial commissioner who acted as a magistrate. The subpoena was introduced into evidence and directed the Petitioner's credit card company to produce the records associated with her credit card. Detective Chandler acknowledged that there "was some nasty stuff going on" between the victim and the Petitioner, elaborating that they were in a custody dispute, that the Petitioner was on probation, and that the victim wanted the Petitioner imprisoned.

The Petitioner testified that she had explained her theory of the case to trial counsel and that trial counsel indicated he understood. Trial counsel did not discuss procuring her bank records, and she did not receive notice under the Bank Record Privacy Act that the records had been subpoenaed. She asked trial counsel to move to suppress her financial records, but he did not do so. The Petitioner did not see any discovery, including her financial records, and did not know her records would be entered into evidence. She did not know that her bank records would be introduced by trial counsel until she was in the midst of testifying.

According to the Petitioner, trial counsel did not discuss with her whether or not she should testify until the day of trial, and he advised her to testify. He did not tell her that she could be impeached with her prior convictions.

The Petitioner testified to the victim's vindictive behavior after their break-up. She stated that while she had provided all the childcare prior to their separation, the couple's child stayed at the victim's home afterward, and the victim attempted to obtain custody. The victim wanted her arrested because he was angry that she left. He repeatedly contacted the authorities to try to get her arrested or to get her probation revoked. The Petitioner had asked trial counsel to present the testimony of her mother, her brother, her bondsman, her probation officer, and an agent from her credit card company. The Petitioner stated that her mother could have testified regarding checks the Petitioner wrote her, which were intended to repay the credit card payments. Her mother also could have testified to the victim's character. The Petitioner's probation officer and bondsman would have offered testimony that the victim contacted them to try to get the Petitioner in trouble. The Petitioner testified that her trial counsel did not interview the representative from her bank who testified that she expressed confusion regarding her account. She also alleged that trial counsel was deficient in presenting the bank employee's testimony because trial counsel did not ask him whether the Petitioner had asked about payments she made which were not reflected in the account. She agreed that

- 7 -

she made the initial payments in August and September, that she met with the bank representative in September, and that she made an additional payment using the victim's account in November.

The Petitioner testified that she was not notified of the hearing on the motion for a new trial and was not present. She saw trial counsel prior to the hearing, but he told her not to go because he was concerned that his wife was having him followed by an investigator.

The Petitioner testified that appellate counsel was not responsive to her attempts to contact him and that he had a substance abuse problem. His appellate brief listed incorrect facts, and he told her as an excuse that it was hard to concentrate because he "had a crush on her." He did not inform her that an appellate opinion had been issued until the night before she was taken into custody. He told her that she should not present her claims of ineffective assistance of counsel until post-conviction. Appellate counsel was censured by the Board of Professional Responsibility, and the censure was entered into evidence.

The Petitioner's probation officer, Ms. Jennifer Tatar, testified that the victim would call her approximately twice a month to give her information which he hoped would result in a probation revocation. Ms. Tatar followed up on the victim's statements, but the Petitioner's probation was not revoked.

Ms. Leah Hulan, the Petitioner's bondsman, received two or more calls from the victim. The victim told Ms. Hulan that the Petitioner was a flight risk and that Ms. Hulan should "get off the bond." Ms. Hulan documented these calls in a letter to the Petitioner.

Reverend Patricia King, the Petitioner's mother, testified the Petitioner and victim lived together for approximately five years, beginning around 2004. The Petitioner was a stay-at-home mother, and the couple also had a nanny. The victim never spoke disparagingly of the Petitioner prior to their break-up, and the Petitioner "was a great mother and a great, what he considered a wife." Rev. King had helped care for her grandchild on weekends and after the Petitioner was involved in an auto accident in 2007. The Petitioner became addicted to prescription medication after sustaining severe injuries in the accident. She went into a rehabilitation facility twice, and Rev. King testified that she paid the Petitioner's bills while the Petitioner was in the rehabilitation facility. The child had also gone on two trips out of the state with Rev. King and her husband, including a two-week trip to Oregon. In December 2009, Rev. King and her husband planned to have the Petitioner's child stay with them. When arranging the visit, she told the victim that the Petitioner would be there, and he did not object. She and her husband then spoke to the victim on the telephone, and the victim stated he had not known the

Petitioner would be present. He called the Petitioner a "f*cking c*nt" and a "whore" repeatedly. The victim stated he would "make sure that [the Petitioner] never had [their daughter] again, and that [Rev. King] would never see her again." The victim threatened to charge Rev. King with harassment and have her arrested if she contacted him regarding the child. Rev. King testified she was "supposed to have been on the witness list" but was not called to testify at trial.

The Petitioner's brother, Mr. William Fisher, testified that he was in the armed services and that the Petitioner's child stayed with his family for approximately one month in 2006, while the Petitioner was undergoing treatment for her addiction. During this month, the victim only saw his daughter once and gave only a little money for diapers. Mr. Fisher testified that the victim's motivation in 2009 was to hurt the Petitioner and that the only way he could do so was to separate her from her child.

Trial counsel testified that he had been practicing law since 2000 and that he was representing the Petitioner on her custody case at the time he undertook her representation on the theft charges. Trial counsel met with the Petitioner regarding the case approximately five to eight times, and some of these meetings also included discussions regarding the civil case. He testified that he reviewed discovery with the Petitioner.

Trial counsel acknowledged that he might have been able to exclude the financial records obtained through judicial subpoena, but he believed that the State would merely have reissued the subpoena and would have eventually obtained the records. Moreover, the victim's bank records showed that his account was debited to pay a Discover card held by the Petitioner. Trial counsel obtained the Petitioner's bank records himself. He introduced them to show that the Petitioner had approximately $10,000 in her account and did not need to resort to theft to make a payment on her credit card.

Trial counsel stated that the Petitioner had always wanted to testify and maintained she was not guilty. Trial counsel agreed that the Petitioner should testify despite her prior convictions because she was the only witness who could present her theory of the case.

Trial counsel sought to have the Petitioner's prior convictions excluded, but the trial court ruled against him. He testified that he informed the Petitioner that she could be impeached with her prior convictions if she testified.

Trial counsel testified that the victim wanted "to make [the Petitioner's] life miserable." Trial counsel acknowledged that he did not interview Rev. King, Mr. Fisher, Ms. Tatar, or Ms. Hulan. He did not recall if the Petitioner mentioned wanting Ms.

Hulan or Ms. Tatar to testify. He acknowledged that it would be important to present information that the victim was trying to get the Petitioner's probation revoked.

Trial counsel testified that although the Petitioner never argued that the victim consented to the payments, the victim's credibility was very important to the case, in part because the victim's theory was that the Petitioner had obtained the bank account number through deceit. Trial counsel tried to attack the victim's credibility through cross-examination.

Trial counsel testified that the Petitioner attended the hearing on the motion for a new trial. The Petitioner's sentence was negotiated after the guilty verdict, and she was ordered to serve seven years on probation. Trial counsel agreed that appellate counsel had an alcohol problem and that he went to a rehabilitation facility at some point.

Trial counsel believed two pieces of evidence were damaging to the Petitioner at trial. First, the Discover card agent who testified for the State told the jury that the Petitioner would have had to enter the entire routing number each time she made a phone payment. Trial counsel stated that he believed this was incorrect, citing his own experience paying by phone on his own Discover card. However, he did not have any witness other than the Petitioner to challenge this testimony. Trial counsel stated he was "bother[ed]" by the incorrect testimony.

Trial counsel also believed that the fact that the Petitioner attempted to make a payment using the victim's account in November was damaging to her theory of the case. He testified that the first four payments were clustered in August and September and that the Petitioner met with her bank representative in September to investigate why her account balance did not match her own records. Although this evidence supported her theory that she did not intend to steal, the fifth attempted payment was made in November. Trial counsel believed that this final payment led to the inference that she made the payments even though she knew the money was not coming from her account.

The post-conviction court denied relief. The post-conviction court concluded that the financial records could not be suppressed due to an alleged violation of the Tennessee Financial Privacy Act. However, the court found that the judicial subpoena was not valid because it was not issued by a judge of a court of record or a general sessions judge but by a judicial commissioner. Apparently examining only the bank records and not the credit card records, the post-conviction court concluded that the decision to introduce the bank records during the Petitioner's testimony was a reasonable trial strategy. The post-conviction court also found that the trial court properly admitted evidence of the Petitioner's prior convictions after a hearing. The post-conviction court denied relief based on trial counsel's failure to investigate, finding that the victim "was cross-

examined relative to his relationship with the [Petitioner], domestic relation issues between [the victim] and the [Petitioner], and said issue was well litigated and thus without merit." The post-conviction court denied relief on the other issues raised in the hearing.

## ANALYSIS

The Petitioner alleges she is entitled to relief from her convictions due to various deficiencies in trial counsel's conduct. A petitioner is entitled to post-conviction relief when a conviction or sentence is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. The petitioner bears the burden of proving the allegations of fact in the petition by clear and convincing evidence. *Id*. § 40-30-110(f). Evidence is clear and convincing when the correctness of the conclusions drawn from the evidence admits no serious or substantial doubt. *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009).

The findings of fact made by a post-conviction court are conclusive on appeal unless the evidence preponderates against them. *Ward v. State*, 315 S.W.3d 461, 465 (Tenn. 2010). This court may not substitute its own inferences for those drawn by the post-conviction court, and questions concerning the credibility of witnesses, the weight and value of the evidence, and the factual issues raised by the evidence are to be resolved by the post-conviction court. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001). "The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness." *Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006).

The right to counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *Pylant v. State*, 263 S.W.3d 854, 868 (Tenn. 2008). The right to counsel encompasses "the right to 'reasonably effective' assistance, that is, assistance 'within the range of competence demanded of attorneys in criminal cases.'" *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). In evaluating a claim of ineffective assistance of counsel, the court must determine "'whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *Vaughn*, 202 S.W.3d at 116 (quoting *Strickland*, 466 U.S. at 686).

To show that relief is warranted on a claim of ineffective assistance of counsel, the petitioner must establish both that counsel's performance was deficient and that the deficiency prejudiced the defense. *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007). Deficiency requires showing that counsel's errors were so serious "that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."

- 11 -

*Strickland*, 466 U.S. at 687. To demonstrate deficiency, the petitioner must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Pylant*, 263 S.W.3d at 868. Courts must make every effort "'to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Felts v. State*, 354 S.W.3d 266, 277 (Tenn. 2011) (quoting *Strickland*, 466 U.S. at 689).

The reviewing court must begin with "the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all strategic and tactical significant decisions." *Davidson v. State*, 453 S.W.3d 386, 393 (Tenn. 2014). "'[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Felts*, 354 S.W.3d at 277 (quoting *Strickland*, 466 U.S. at 690-91). Generally, a post-conviction court gives deference to strategic decisions, "but only when such choices are informed ones based upon adequate preparation." *Moore v. State*, 485 S.W.3d 411, 419 (Tenn. 2016).

In determining prejudice, the post-conviction court must decide whether there is a reasonable probability that, but for the errors, the result of the proceeding would have been different. *Grindstaff*, 297 S.W.3d at 217. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Honeycutt*, 54 S.W.3d at 768 (quoting *Strickland,* 466 U.S. at 694). "That is, the Petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." *Finch*, 226 S.W.3d at 316. A claim may be denied for failure to prove either deficiency or prejudice, and a court need not address both prongs if the petitioner has failed to establish either deficiency or prejudice. *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

### I. Motion to Suppress

The Petitioner asserts that but for trial counsel's failure to challenge the introduction of her financial records, they would have been suppressed. She argues that the disclosure of her records violated the Tennessee Financial Privacy Act and that they should have been suppressed accordingly. *See* T.C.A. §§ 45-10-104(a)(2), -106. She further argues that the use of an administrative subpoena violates the protections against unreasonable searches and seizures. The post-conviction court first found that the evidence could not be excluded pursuant to the Tennessee Financial Privacy Act. While the court found that the subpoena was improperly issued, it ultimately concluded that the

Petitioner could not show prejudice. The post-conviction court's analysis was limited to the bank records. We observe that the bank records were not obtained pursuant to the subpoena; the subpoena was only used to obtain the Petitioner's Discover card records. The post-conviction court made no findings regarding any prejudice accruing from the State's introduction of the credit card records.

## A. Bank Records

The Petitioner, like the post-conviction court, does not differentiate between the credit card records which were produced pursuant to the judicial subpoena and her bank statements, which her trial counsel obtained and introduced during her testimony.[1] Insofar as she claims that her counsel was deficient in not suppressing her bank records and that the deficiency was prejudicial, we conclude that trial counsel had no basis to suppress the records, which were not introduced in the State's case-in-chief and not obtained pursuant to the subpoena but were obtained by and introduced by the defense. Moreover, insofar as the Petitioner objects to the strategic decision to introduce the bank records, trial counsel articulated a sound reason for introducing the records at trial: to show that the Petitioner had made a large deposit contemporaneously with her substantial credit card payments, attempting to corroborate her testimony that she believed the payments would come out of her own account. The bank account information also demonstrated that the Petitioner wrote her mother a check for an amount similar to one attempted credit card payment, corroborating her testimony that she thought that that payment would come from her mother's account. Accordingly, we agree with the post-conviction court that the introduction of the bank records was sound trial strategy and that the Petitioner cannot demonstrate deficiency.

## B. Credit Card Records

The Petitioner also objects to the introduction of her credit card records. The post-conviction court found that the judicial subpoena was improperly issued by a judicial commissioner and was therefore invalid. The post-conviction court did not make findings regarding prejudice related to the suppression of the credit card records.

The Petitioner claims that she was not notified of the subpoena, that the requirements of the Tennessee Financial Records Privacy Act were not met, and that her counsel was ineffective in not suppressing the records on this basis. *See* T.C.A. § 45-10-

---

[1] As the State points out, the Petitioner's suggestion that there was a subsequent subpoena for her bank records is not supported by the record or her citation to the transcript; the transcript instead reflects that the subpoena referred to *the victim's* bank account as the source of missing funds.

106 (allowing the service of a subpoena on a "financial institution" only when the customer has been served with a copy as delineated in the statute). We note initially that this statute applies only to subpoenas served on a "financial institution," which the statute defines as "a bank, savings and loan association, industrial loan and thrift company, credit union, mortgage broker, mortgage banker, or leasing company accepting deposits, making or arranging loans and making or arranging leases." T.C.A. § 45-10-102(3). In any event, as the post-conviction court noted, this statute does not require evidence to be suppressed in the event of a violation. *State v. Rickey Bradford*, No. M2012-02616-CCA-R3-CD, 2014 WL 2494548, at *15 (Tenn. Crim. App. May 30, 2014) (concluding that noncompliance with the statute did not render records inadmissible); *State v. James Michael Naive*, No. M2012-00893-CCA-R3-CD, 2013 WL 4505395, at *14 (Tenn. Crim. App. Aug. 21, 2013) (noting that the statute does not provide for suppression in the event of noncompliance); *State v. M. Dale Lowe*, No. 89-92-III, 1990 WL 176722, at *9 (Tenn. Crim. App. Nov. 15, 1990).

The post-conviction court relied on *State v. Scott McLain*, No. E2012-01082-CCA-RM-CD, 2013 WL 709616 (Tenn. Crim. App. Feb. 26, 2013), for the proposition that the subpoena could only be issued by a "Judge of a Court of record or a General Sessions Judge" and that the subpoena issued by a judicial commissioner was thus invalid. In *Scott McLain*, the defendant's blood was obtained pursuant to a subpoena while he was being treated at a hospital after having run off the road in his vehicle. *Id.* at *1. In the trial court, the defendant had objected that the subpoena was improperly issued because it was signed by a clerk and not a judge. *Id.* at *4. The State had responded that it would reissue the subpoena, but it ultimately did not do so, and the State's evidence depended on the subpoena issued by the clerk. *Id.* This court noted that while a court clerk might have the authority to issue a subpoena or arrest warrant under Tennessee Rules of Criminal Procedure 17(a) or 4(c)(1)(A), the statute which authorizes a law enforcement officer to obtain data for the purpose of "establishing, investigating or gathering evidence for the prosecution of a criminal offense" specifically requires an affidavit to be submitted to "either a judge of a court of record or a general sessions judge who serves the officer's county of jurisdiction." *Scott McLain*, 2013 WL 709616, at *4; *see* T.C.A. § 40-17-123(a), (d)(1). Under the statute, a subpoena issued by a general sessions judge is only valid within the county in which the judge has jurisdiction. *Id.* § 40-17-123(f). The *Scott McLain* court concluded that the subpoena was invalid because it was not issued by a judge of a court of record or a general sessions judge, and the court dismissed the charges against the defendant. *Scott McLain*, 2013 WL 709616, at *5. The post-conviction court found that the subpoena here was issued by a judicial commissioner, and we agree with the post-conviction court that, under *Scott McLain*, the subpoena was invalid because it was not issued by a judge. Because the post-conviction court analyzed only the bank records as part of this issue, it made no findings regarding

- 14 -

any prejudice accruing from the failure to quash the Discover card records, which were the actual subject of the subpoena.

The Petitioner cites to cases which stand for the proposition that the prohibition against unreasonable searches and seizures extends to businesses as well as individuals and that a civil subpoena may also be subject to certain constitutional strictures. *See*, *e.g.*, *State Dep't of Revenue v. Moore*, 722 S.W.2d 367, 373 (Tenn. 1986). While the Petitioner argues that any subpoena issued pursuant to Tennessee Code Annotated section 40-17-123 is a violation of the prohibition on unreasonable searches and seizures, she does not provide any authority for the proposition. *See State v. Nathaniel P. Carson*, No. M2010-02419-CCA-R3-CD, 2012 WL 1484188, at *15 (Tenn. Crim. App. Apr. 27, 2012) (holding that the affidavits for the judicial subpoenas established nexus and that the subpoenas did not violate the right against self-incrimination); *see also State v. Harrison*, 270 S.W.3d 21, 32 (Tenn. 2008) (holding that district attorney general could not use a subpoena under the statute as a discovery device). The statute requires law enforcement to submit an affidavit and requires the judge to find that there is a reasonable basis to believe that a specific criminal offense has been or is being committed, that the documents requested will materially assist with the investigation of the offense, that there is a clear and logical nexus between the production and the offense, and that the scope of the request is not unreasonable. *Id.* 40-17-123(c), (d). We note, moreover, that the post-conviction court specifically found that the Petitioner did not challenge the statute as unconstitutional, and because we have concluded that the post-conviction court correctly found that the subpoena was not validly issued on other grounds, we do not address the constitutional argument.

Instead, we hold that the Petitioner cannot in any event show prejudice resulting from trial counsel's failure to suppress these records. First, the testimony at the hearing demonstrates that the State had the victim's bank records showing that payments were made to the Petitioner's Discover card prior to issuing the subpoena. These records showed the amount of the payment, that the payment was made to Discover, and that the payment was applied to a card in the Petitioner's name. The Discover card records merely corroborated this information. As trial counsel testified, the State had independent evidence, in the form of the victim's bank statements, that unauthorized payments were made from the victim's bank account to the Petitioner's credit card account, and had the records obtained pursuant to the subpoena been suppressed, the State could subsequently either have sought the records by another avenue or proceeded with the cumulative evidence drawn from the victim's bank account.

Moreover, the Petitioner never contested that she made payments to her Discover card or that the payments came from the victim's bank account. The Discover records only confirmed the evidence from the victim's bank account that payments were made.

- 15 -

The Petitioner acknowledged as much and instead presented a theory and evidence that the payments were made inadvertently from the wrong account. Accordingly, even if the Petitioner had succeeded in excluding the records and even if the State had not found another means to introduce the records, such as a subsequent subpoena, there is no reasonable probability that the outcome of the trial would have been different.

## II. Evidence of Prior Convictions

The Petitioner asserts that her prior convictions should have been inadmissible because the crimes, obtaining and attempting to obtain prescription medication by fraud, were too similar to the crimes for which she was under trial. She contends that trial counsel was deficient in not having them excluded. The post-conviction court found that a hearing was held and that the trial court properly determined that the convictions were admissible.

The record indicates that the trial court found the convictions admissible under Tennessee Rule of Evidence 404(b) which delineates the admissibility of proof of "other crimes, wrongs, or acts." The trial court, in making the initial determination regarding admissibility while the Petitioner was on the stand, candidly stated that it was unsure which rule the evidence should be analyzed under and stated that it would look at the language of the rule later. The court nevertheless found the proof admissible, noting that the crimes were not particularly similar and that the evidence was probative of credibility. The trial court found that the probative value was not "substantially outweighed by the prejudicial effect." After the close of proof, the trial court returned to the issue, analyzing the evidence under Rule 404(b). The court determined that the evidence was relevant to an issue other than character, which was credibility, that the evidence of the past crimes was clear and convincing, and that the probative value was not outweighed by danger of unfair prejudice. We note that the determination of the admissibility of prior crimes, and the findings related to that determination, should properly take place before the evidence is ruled admissible. *See* Tenn. R. Evid. 404(b) ("The conditions which must be satisfied *before* allowing such evidence are…." (emphasis added)); Tenn. R. Evid. 609(a)(3) ("The court may rule on the admissibility of such proof prior to the trial but in any event shall rule prior to the testimony of the accused.").

We also observe that the evidence here was not offered as substantive evidence but as impeachment material. *See State v. Nathan McKissack*, No. 01C01-9804-CC-00190, 1999 WL 77846, at *7 (Tenn. Crim. App. Feb. 19, 1999) ("Rule 404(b) specifically governs the admission of evidence of other crimes as substantive evidence."). The State did not seek to admit the convictions until the Petitioner chose to testify, and it merely sought to cross-examine her regarding her convictions, noting that credibility was important to the resolution of the case. The evidence should properly have been analyzed

- 16 -

under Tennessee Rule of Evidence 609, which notes that "[f]or the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime may be admitted" under certain conditions. Tenn. R. Evid. 609(a). Rule 609(a)(3) requires notice of the material, which was given here, and directs the trial court to determine upon request whether "the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues." To be admissible, the crime must be either punishable by death or imprisonment in excess of a year or a crime involving dishonesty, and generally less than ten years must have elapsed between the date of release from confinement and the subsequent prosecution. *See State v. Mixon*, 983 S.W.2d 661, 674 (Tenn. 1999). Accordingly, the trial court should have made the predicate factual findings under Rule 609 and should have made the findings prior to the testimony.

However, in examining the admissibility of the evidence, we conclude that the Petitioner cannot demonstrate prejudice from any alleged deficiency in the performance of trial or appellate counsel regarding this issue. *See State v. Lankford*, 298 S.W.3d 176, 181-82 (Tenn. Crim. App. 2008) (holding that a reviewing court should determine admissibility under either Rule 404 or Rule 609 if the trial court failed to comply with the procedural requirements). We note that, despite the procedural deficiencies, the trial court properly analyzed the similarity of the two crimes and the relevance of the prior convictions to credibility. *See Lankford*, 298 S.W.3d at 180-81 (noting that even a prior conviction identical or similar to the crime at issue may be admissible to impeach, although the prejudicial effect may be increased by similarity). The Petitioner's prior convictions involved fraud and were therefore particularly probative of credibility. *State v. Waller*, 118 S.W.3d 368, 371 (Tenn. 2003) ("To determine how probative a felony conviction is to the issue of credibility, the trial court must assess whether the felony offense involves dishonesty or false statement."); *State v. Walker*, 29 S.W.3d 885, 890 (Tenn. Crim. App. 1999) (noting that dishonesty and false statement are "more directly related to a defendant's truthfulness"). Contrary to the Petitioner's contentions, the prior convictions were not particularly similar to the crimes for which she was on trial. *State v. Russell*, 382 S.W.3d 312, 317 (Tenn. 2012) (holding that prior convictions for passing worthless checks were not substantially similar to theft charge). Her prior convictions required a finding that she obtained prescription drugs through "misrepresentation, fraud, forgery, deception, or subterfuge" but did not have anything to do with theft. *See* T.C.A. § 53-11-416(a). The Petitioner's theft charges did not involve any sort of deceit or misrepresentation but merely the unauthorized taking of funds from a bank account. The theft may have been a crime of dishonesty, but there was no evidence of fraud. The State properly gave notice that the convictions would be used for impeachment. Accordingly, the evidence was properly admitted, and there is no reasonable probability that any failure to challenge or appeal the admission of the evidence affected the outcome of the trial.

### III. Failure to Call Witnesses

The Petitioner challenges trial counsel's failure to investigate or to present the testimony of several witnesses. When a claim of ineffective assistance of counsel is premised on counsel's failure to interview or call witnesses, the witnesses must be presented at the post-conviction hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). "As a general rule, this is the only way the petitioner can establish that ... the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." *Pylant*, 263 S.W.3d at 869 (quoting *Black*, 794 S.W.2d at 757). This is because the court cannot speculate as to what a witness's testimony might have been. *Black*, 794 S.W.2d at 757. Presenting the witness allows the post-conviction court to determine whether that witness's testimony would have been credible, material, and admissible. *Pylant*, 263 S.W.3d at 869-70.

At the post-conviction hearing, the Petitioner presented the testimony of Ms. Tatar that the victim called approximately twice a month to convey information to Ms. Tatar which he hoped would result in the Petitioner's probation being revoked. Ms. Hulan likewise testified that the victim contacted her multiple times to try to persuade her to remove herself as the Petitioner's bondsman based on an allegation that the Petitioner would flee. Rev. King testified that the victim did not disparage the Petitioner until their break-up but that he was disparaging afterward. The victim, who had not in the past objected to Rev. King spending time with his child, threatened her with imprisonment if she contacted him regarding the child. Moreover, Rev. King testified that the victim had told her that he did not have a problem with the Petitioner's spending time with his child at Rev. King's home and then subsequently denied the conversation when they next discussed that the Petitioner would be there. Rev. King also testified that she had paid the Petitioner's bills while the Petitioner was in rehabilitation. Mr. Fisher confirmed that the victim had not been interested in seeing his child while his child was staying with Mr. Fisher, and he testified that the victim was trying to get custody only to be vindictive.

Trial counsel acknowledged not having interviewed any of these witnesses. He testified that he did not remember the Petitioner's requesting him to obtain the testimony of Ms. Hulan or Ms. Tatar. Trial counsel did not give any reason for not calling any of these witnesses, although he agreed that inherent in Ms. Tatar's testimony would be the revelation that the Petitioner was on probation.

We note that we are somewhat hampered in our review by the paucity of the post-conviction court's findings on the issue. The post-conviction court's analysis on this issue was limited to two sentences concluding that the victim had been cross-examined regarding his domestic relationship with the Petitioner and that the issue "was well

litigated and without merit." The post-conviction court made no findings on the credibility of the witnesses called at the hearing, and it made no finding regarding whether trial counsel was aware of the witnesses and no findings regarding the circumstances of trial counsel's decision not to call the witnesses. We read the post-conviction court's findings as a determination that there was no prejudice from the failure to introduce these witnesses.

The evidence at trial established that the Petitioner used the victim's bank account to pay her credit card, and the only disputed issue was whether she did so inadvertently. The testimony of the victim and the Petitioner differed only on a very limited number of material facts. Most importantly, the Petitioner testified that the victim had paid her credit card in the past and that the company would therefore have his bank account on file. The victim disputed this. He acknowledged it was possible he had paid on the account with a check in the past and speculated that the Petitioner could have gotten his account number from a check or from a checkbook at his home. However, he also testified that, immediately prior to trial, he had discovered an additional payment made from his account to the Petitioner's card in April. His testimony was that the Petitioner entered her rehabilitation program almost immediately after the holidays and that her friend was at his home as a nanny during most of 2009. The Petitioner testified that she attempted to make one credit card payment in early August under the assumption that the funds would come from her mother's account, and she wrote her mother a check to reimburse her. When this payment could not be processed, she used a different account on file, assuming it to be hers. She made some investigation into the fact that the funds were not coming out of her account, but she ultimately used the account again in November. The Discover card representative testified that a caller would have to give the entire bank account number. The Petitioner at trial and trial counsel at the post-conviction hearing testified that the agent's testimony was incorrect.

The jury ultimately had to make a credibility determination, either to believe that the victim's bank account was on file and the Petitioner's use of it was inadvertent or to believe that the Petitioner obtained the account number and intentionally used the victim's funds. The testimony offered at the post-conviction hearing reflected on the credibility of the victim to some extent. Ms. King testified that the victim told her that he did not mind the Petitioner's being at Ms. King's home with her daughter and then subsequently denied having told her that. Ms. King also confirmed that she had paid some of the Petitioner's bills prior to her release from the rehabilitation program. While Ms. Hulan and Ms. Tatar testified regarding the victim's ill-will toward the Petitioner, they did not explicitly state that he was dishonest with them. Mr. Fisher testified only that the victim had little interest in his own daughter and behaved maliciously toward the Petitioner. We conclude that the testimony regarding the victim's vindictiveness cannot establish prejudice. While the victim may have behaved maliciously toward the

- 19 -

Petitioner, evidence of the victim's behavior and the couple's animus was introduced during trial, and the victim's behavior ultimately did not have any impact on the question before the jury: whether the Petitioner was being truthful when she said that she thought the account she was using to pay her credit card was her own bank account.

The victim's credibility did have some bearing on this determination because he initially testified that the Petitioner's credit card company would not have had his account on file because he had never made payments to her credit card. However, the victim ultimately conceded that he may have made a payment by check, and moreover, he testified on cross-examination that the day before trial, he had discovered a payment from his account to the Petitioner's credit card in April 2009. Accordingly, both the Petitioner and victim agreed that the victim's bank account was used to pay the Petitioner's credit card in August and September 2009, that the victim did not give permission for his account to be used, and that the victim's account had previously paid the Petitioner's Discover bill. The credibility determination before the jury was not a choice between the victim's version of events or the Petitioner's version. It was instead a choice between believing the Petitioner's testimony that the payments were inadvertent or inferring from the circumstances of the payments that they were intentional. Accordingly, while the Petitioner's credibility was very important in reaching a conviction, the victim's was less so, because the material aspects of his testimony were either confirmed by financial records or in agreement with the Petitioner's testimony. Based on this analysis, we conclude that the Petitioner has fallen short of establishing prejudice based on trial counsel's failure to call witnesses. The ultimate issue at trial centered around the Petitioner and her awareness that she was using the victim's bank account. We cannot say that there is a reasonable probability that if trial counsel had called the witnesses, the results of the proceeding would have been different.

## IV. Appellate Counsel

On appeal, the Petitioner's main claim regarding appellate counsel is that appellate counsel was not responsive and did not communicate with her. The Petitioner alleges no particular prejudice from these alleged deficiencies, and accordingly, she is not entitled to relief. We note that appellate counsel's advice to reserve any claim regarding trial counsel's ineffectiveness for post-conviction, which the Petitioner challenged, was sound. This is because "the practice of raising ineffective assistance of counsel claims on direct appeal is fraught with peril since it is virtually impossible to demonstrate prejudice as required without an evidentiary hearing." *State v. Blackmon*, 78 S.W.3d 322, 328 (Tenn. Crim. App. 2001) (quotations omitted).

## V. Cumulative Error

The Petitioner also asserts cumulative error.  This court has previously held that a petitioner "who has failed to show that he received constitutionally deficient representation on any single issue may not successfully claim that his constitutional right to counsel was violated by the cumulative effect of counsel's errors." *Tracy F. Leonard v. State*, No. M2006-00654-CCA-R3-PC, 2007 WL 1946662, at *21 (Tenn. Crim. App. July 5, 2007) (citing cases).  The Petitioner does not explain which errors combined to deprive her of the constitutional right to counsel, resulting in prejudice, and she is not entitled to relief.

## CONCLUSION

Based on the foregoing analysis, we affirm the judgment of the post-conviction court.

_____
JOHN EVERETT WILLIAMS, JUDGE